STATE OF NEW YORK, Respondent, v. ABORTION INFORMATION AGENCY, INC., et al., Appellants.

First Department, July 1, 1971.

*Arthur H. Sobel* of counsel (*Kenneth J. Rome* with him on the brief; *Kimmelman, Sexter & Sobel,* attorneys), for appellants.

*Mark T. Walsh* of counsel (*Samuel A. Hirshowitz, Barnett Levy, Stephen Mindell* and *William F. Jerome* with him on the brief; *Louis J. Lefkowitz, Attorney-General*), for respondent.

*Per Curiam.* We would affirm on the opinion at Special Term (Asch, J.), but would add the following. Special Term's decision was based essentially on three findings. (1) It found as a matter of law, the public policy of the State '' is opposed to the practice of acting as an intermediary or broker in the sale of professional services '', and the Abortion Information Agency was so engaged. (2) The court found that A.I.A.'s practice amounted to fee splitting which '' on its face violates '' section 6514 of the Education Law and finally (3) that A.I.A.'s method of operation constituted the practice of medicine in violation of subdivision 1 of section 6501 of the Education Law. These findings were overwhelmingly supported by the incontrovertible proof submitted at Special Term.

As to the finding that the '' public policy of the State is opposed to the practice of acting as an intermediary or broker in the sale of professional services '', the court relied upon the case of *Matter of Co-op. Law Co.* (198 N. Y. 479, 484) where the court stated, '' A corporation can neither practice law nor hire lawyers to carry on the business of practicing law for it any more than it can practice medicine or dentistry by hiring doctors or dentists to act for it.'' That case is applicable here, for the entire mode of operation so clearly established is that the defendants hire the hospital and make all arrangements with the hospital. It is the defendant corporation that is billed by the hospital, not the patient. As the record shows, the defend-

ant and the hospital are clearly the contracting parties, and there is not even any indication that the patient herself undertakes any responsibility pursuant to contract insofar as her obligation to pay the hospital. This is A.I.A.'s responsibility, apparently agreed to by the hospital. While the Supreme Court in *Railroad Trainmen* v. *Virginia Bar* (377 U. S. 1) upheld a situation where a union chanelled legal employment to particular lawyers in order to advise and protect union members, such is not analogous to the situation at bar, for in that case there is no indication that the union itself hired the attorneys — thus bypassing the ordinary attorney-client relationship. In finding the practices utilized herein violative of public policy, we also take note of the opinions of the Attorney-General on the subject. (1946 Opns. Atty. Gen. 314, 315; 1963 Opns. Atty. Gen. 50.) The opinions of the Attorney-General are persuasive and entitled to consideration by this court.

With relation to the finding that the practice of the defendants on its face violates section 6514 (subd. 2, par. [f]) of the Education Law, constituting illegal fee splitting, that finding too must be sustained. While the provision against fee splitting is particularly aimed against members of the medical profession, nevertheless, that section of the law prohibits payments in general (as a matter of public policy) for referring a client to a physician. The participation by the defendant in any arrangement which involves fee splitting by a physician is clearly against public policy. The affidavits disclosed the behind-the-scenes arrangements between A.I.A. and the co-operating doctors and hospital. In fact, the affidavit submitted by defendant John A. Settle admits that defendants were granted a discount in hospital charges amounting to their referral fees. That the discount may not have involved an increase in cost to the patient is irrelevant. What is clear from the affidavit, is that if the hospitals were contacted directly by the patient, a different fee would of necessity have been demanded. This is the logical conclusion from the admission that a discount was granted in an amount equal to the referral fee. The discount then quite clearly is the equivalent of fee splitting.

With respect to the admission that the defendants were able to obtain discounts at hospitals, and further taking into account the entire background of dealings between the defendants and hospitals, it is quite clear that plaintiff has made out a clear and convincing case concerning the inherent dangers to the public involved in this situation, considering the distinct probability of domination by the agency of the institutions. Contrary to

the dissent's conclusion that such created only an issue of fact, in the circumstances of this case, the record being replete with the overwhelming probability that such is the situation, a temporary injunction was not only properly granted, but was mandated for the protection of the public.

Additionally, the finding that A.I.A.'s procedures constituted the practice of medicine in violation of section 6501 of the Education Law was correct. Subdivision 4 of section 6501 of the Education Law defines the practice of medicine as follows: " A person practices medicine within the meaning of this article * * * who holds himself out as being able to diagnose, treat, operate or prescribe for any human disease * * * or who shall either offer or undertake, by any means or method to diagnose, treat, operate or prescribe for any human disease ". It is quite clear under the facts developed in the record that the defendants did engage in diagnosing a human or physical condition. Defendants' employees were specifically instructed to interrogate women making inquiries upon a variety of matters pertinent to determination of the type of operation required and to inform the prospective patient as to the type of operation for which the caller qualified. This constitutes an attempt at a diagnosis by one not qualified to act as a physician, or acting under the direction and supervision of a physician. Moreover, A.I.A. also engaged in giving preadmission directives, which is also violative of the statute.

In addition to the grounds upon which Special Term reached its conclusion, there is yet another reason which justifies affirmance of the order. The record shows that a comprehensive fee is charged and that such " is a guaranteed flat charge that covers everything * * *. Even if minor complications * * * require an extra stay in the hospital, blood, special laboratory work or medications, you never pay anything more * * * All extra charges not defrayed by [the patient's] insurance coverage (if any) would be borne by the hospital and/or A.I.A." Such practice would appear to constitute the practice of the business of insurance (Insurance Law, § 41), and the defendants not being licensed to conduct an insurance business, their activities were illegal (Insurance Law, § 40, subd. 1).

Finally, we would like to add these final comments. From the beginning to end, A.I.A.'s operation has the appearance of one conceived in fraud. The certificate of incorporation for example provides that the purpose of the corporation is: " To provide general information concerning legal abortions to the public and to women with problem pregnancies. The corporation,

nor its agents, shall not undertake to diagnose pregnancy, or any other physical or mental condition of a client. The corporation shall not undertake to advise a client on the medical desirability of obtaining an abortion, nor shall it provide any information or perform any act which may constitute the practice of medicine.''

The appearance then was the creation of an informational agency, not a business which would engage so extensively in the procurement of hospital services and make all arrangements for abortions. This combined with the manner in which the corporation functioned demonstrates an undisclosed intent to conceal the real nature of defendants' business.

Also to be noted is the manner of contact between the patient and defendants. The overwhelming contacts were made over the telephone. Although the defendants' advertising gives the impression of having trained counselors, they were without any real training in the field and operated without any proper supervision. Moreover, affidavits of various former employees indicate the extent to which the caller would be discouraged from seeking other aid, and encouraged to register with the appellant corporation.

We do not dispute that those women desiring abortions are entitled under the law to have them. But, that does not mean that we should countenance an operation where under the guise of providing information, women are instead solicited and encouraged to seek out abortions. That the initial inquiry concerning the abortion is made by the patient does not negate the fact the defendants' methodology once a patient contacted it was to further encourage the abortion, for the sole motive of financial gain to defendants, rather than to aid in giving objective and concerned advice to the patient. The nature of the business we are dealing with requires the court to give close scrutiny to the facts in an attempt to provide maximum assurance that those who are merely inquiring as to information concerning abortions are not improperly influenced or induced to have such abortion. This is all the more necessary when we are dealing with unlicensed people entering a field where generally, licensing and supervision are necessary.

Despite the fact that the appeal is from an order which granted drastic relief, we find as did the court below, that the evidence overwhelmingly justifies the granting of such relief. Unquestionably, defendants' operation presents a superficial aspect of legality and regularity. But it is the duty of the Attorney-General and of the courts, to penetrate below the surface and to reach the

essence of what defendants are doing. When that is done, there emerges a clear picture of the practice of medicine, fee splitting, a measure of insurance and a totality of procedure which violates the public policy of the State. That conclusion cannot be dissipated by sophistical argument.

Accordingly, the order entered May 20, 1971, granting petitioner's application, should be affirmed with costs and disbursements.

STEUER, J. (dissenting). A temporary injunction has been granted against defendants preventing them from conducting an abortion referral agency and from collecting fees in connection therewith. A temporary receiver has been appointed. The conceded purpose is to prevent the defendant from continuing its business, and this has effectually been done without any trial. It is almost inconceivable that such drastic action could be had and countenanced where determination rests solely upon inferences drawn from facts. The only possible explanation is that when abortion at the pleasure of the woman involved was legalized, thereby abolishing a deep rooted public antipathy, it was not contemplated that the local response to the lifting of the ban would be anything like as great as it proved to be, or that women throughout the nation would seek to take advantage of our laws and our facilities for this purpose. The volume appalled the public mind, and any service or facility which made the practice more available became an obvious target. When the service reached sizable proportions the reaction became hysterical, which hysteria is typified by the excerpt reported below from Special Term's opinion, and the continued iteration of the size and financial success of defendant's operation as proof that such operation is illegal.

While every imaginable make weight argument is advanced to support the determination, the grounds of decision below are the claim that the defendant has been practicing medicine; that it is engaged in fee splitting; and that its operation is against public policy.

Taking these in order, there is absolutely no proof that the defendant is practicing or ever has practiced medicine. Practicing medicine is defined in the Education Law (§ 6501, subd. 4) as diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition. The defendant has not been shown to do any of these. As a result of advertising, defendant receives a very large number of telephone calls from women all over the country who are interested in having an abortion performed. After ascertaining that the

caller desires an abortion, she is advised as to how this may be done — through her own physician making arrangements with a local surgeon, through recommendation of medical societies, or the like. If the caller desires the services of defendant, some facts as to the pregnancy are elicited. From these the defendant, through its counselor, makes an estimate of the type of operation that will be required and the cost of the physician's and hospital services required for such an operation, and adds to this the amount of its fee. It quotes this fee to the caller and, if it is acceptable, the caller is directed to transmit the same forthwith. Arrangements are then made for the caller to enter a licensed hospital, where she is examined by a physician. After the latter has made his examination he determines the type and feasibility of the operation. The patient then has the option of consenting to or refusing to undergo the type of operation which the doctor determines should be performed. If she consents and the operation and care involve a greater expense than the sum she has paid, she must pay the additional sum. If less is involved, she gets a refund. If the patient, after examination, refuses to go further because of additional expense or for any other reason, an effort is made to find her another hospital or doctor suitable to her. There is absolutely no proof that anything further is done. The defendant makes no diagnosis, does not determine what operation is to be performed, does not perform it, and has nothing to do with the way it is performed or the patient is treated thereafter. No decided case has ever held that what the defendant does here would be practicing medicine.

The next charge is fee splitting. Preliminarily it should be noted that the only statutory interdiction against fee splitting is a prohibition against doctors soliciting or profiting by a portion of the fee charged by another doctor, a hospital, laboratory service or the like (Education Law, § 6514, subd. 2, par. [f]). The evil designed to be obviated is the recommendation by the doctor to one supplying the additional service so that the doctor will profit from an unnecessary service. Assuming that the evil is equally present if the recommendation is made by a layman and should be prohibited even in the absence of statutory prohibition, the record is barren of any proof that the defendant ever participated in any such act. There is not even a suggestion that any doctor or any hospital ever rebated any part of his fee or its charges to defendant or offered defendant an inducement of any kind to send patients to it. The issue is completely glossed over by reference to the flat fee charged, with the biased conclusion that this must invoke a rebate or else defendant's receipts would not be so large.

With regard to public policy the situation is somewhat different. While the grounds for decision above discussed rest on no proven facts and only on conclusory distortions of facts, the issue of public policy does have an arguable basis. While this showing is considerably short of the clear legal right necessary to sustain an injunction, at least an issue is presented. In the first place, it must be determined what the public policy is that it is claimed is being violated. The Attorney-General claims it is a general policy against referrals for professional services. In support of this the Attorney-General cites three cases. In *Hannon* v. *Siegal-Cooper Co.* (167 N. Y. 244) it was held that where a corporation holds itself out as practicing dentistry it is liable for the malpractice of the dentist even though its acts were *ultra vires*. *People* v. *Woodbury Dermatological Inst.* (192 N. Y. 454) held that a statute making it a misdemeanor for any person not a doctor to advertise to practice medicine applied to a corporation as well as an individual. *Matter of Co-op. Law Co.* (198 N. Y. 479) holds that a corporation may not engage in the practice of law and its incorporation for that purpose is not authorized. To argue that these citations bespeak a public policy against professional referrals is nonsense in the primary meaning of that word. As is resort to the ringing words of Special Term's opinion that '' The law which sought to emancipate women from servitude as unwilling breeders, did not intend to deliver them as helpless victims of commercial operators for the exploitation of their misery.'' Doubtless it did not. And the inaccuracy is that it has not. Defendant does not recruit women for abortions. It caters to their desire to have the abortion performed. We may not like the prospect of the vast numbers of women currently shirking the burdens of motherhood but there is nothing in the law that requires the availability of the service to be made secret or difficult to obtain. The man who shows a pregnant woman the way to a hospital for purposes of an abortion commits no crime. Lambs do not customarily seek out the butcher.

If there ever was a public policy against professional referrals it must have ceased to exist. The example of legal services points clearly to this. The familiar decision that labor unions may provide such services for its members (*Railroad Trainmen* v. *Virginia Bar*, 377 U. S. 1) and the proliferation of corporations which provide such services for the indigent (see *N.A.A.C.P.* v. *Button*, 371 U. S. 415) with the blessing of the State government show the policy to be the exact contrary.

While there is no public policy against referrals as such, there may well be when the referral procedure attains such dimensions that it enables the referrer to dictate to the practitioners and institutions to which it makes those referrals. When domination of professional activity is attained, public policy is contravened (*People* v. *Allied Med. Clearing House,* 55 Misc 2d 489, affd. 29 A D 2d 919). That dominance could be reached by controlling or substantially affecting the number and kind of patients admitted to a hospital. Whether the defendant is in that position with regard to any hospital or doctor is a factual question which would require a trial.

The order granting the injunction should be reversed and the receivership vacated.

MARKEWICH, J. P., NUNEZ and TILZER, JJ., concur in *Per Curiam* opinion; STEUER, J., dissents in an opinion.

Order, Supreme Court, New York County, entered on May 20, 1971, affirmed. Respondent shall recover of appellants $30 costs and disbursements of this appeal.