OPINION OF THE COURT
Eugene R. Wolin, J.
The Attorney-General has instituted this proceeding pursuant to subdivision 12 of section 63 of the Executive Law seeking permanent injunctive relief as well as an order directing respondents to make restitution to their customers.[1]
The facts, as alleged in the petition, may be briefly stated. Robert Baretz is the president .and principal shareholder of Midland Equities of New York, Inc. (Midland). His spouse, Shirley Baretz also known as Shirley Dorf, holds the position of vice-president and secretary of the corporation. Midland was organized under the laws of New York in November, 1979 and was engaged as a mortgage consulting firm until it ceased operation in July, 1981. Specifically Midland as well as Baretz and Dorf held themselves out to be specialists in obtaining additional financ *204 ing for homeowners threatened with mortgage foreclosure. The method of operation of respondents was simple: a search of public records yielded the names and addresses of persons against whom foreclosure actions had been initiated and were pending. These homeowners were contacted, initially, by telegram and then by letter; the thrust of these communications was that respondents would be able “to stop the foreclosure and save your house.”
Those who responded were interviewed by Dorf who stressed the ability of respondents to obtain additional financing for beleaguered homeowners; no mention was made of an eventual and inevitable[2] referral to an attorney.[3] The clients who desired to retain the services of respondents were then given a contract to sign and a financial questionnaire to complete. The contract was a four-page printed form pursuant to which Midland promised to provide a solution to the client’s foreclosure suit. The solution was further defined as any one of the following:
(a) obtaining a loan commitment.
(b) obtaining a purchaser for the client’s home with a repurchase option for the client.
(c) obtaining and retaining counsel to renegotiate the mortgage.
(d) obtaining counsel to file a wage earner plan.
The contract also contained a disclaimer of any warranty or representation by Midland, as well as a clause indicating that the terms and conditions of the document had been knowingly and intelligently explained to the client”. Apart from these sections the bulk of the contract was concerned with details of the potential loan. As to compensation, the printed form indicated that the fee for Midland’s services was $1,000, however the supporting affidavits indicate that this fee was regularly discounted and that the fee actually charged by respondents ranged from a low of $350 *205 to a high of $1,000, with the usual fee being $500. It is admitted that during their 19 months of operation respondents netted in excess of $170,000 in fees from approximately 275 clients. To continue with the internal operation of Midland, once the contract had been executed, the questionnaire completed and the fee paid by the client, Dorf and Baretz would forward the file to Norman J. Bergman, Esq., for a legal opinion as to “the best approach to take in solving the foreclosure suit”. Bergman was on retainer to Midland and would routinely review the file and ascertain the amount of arrears on the mortgage. Bergman’s response to Midland was a three-sentence form letter in which the amount of the particular client’s mortgage arrears was filled in and which recommended, in the final sentence, the possibility of a proceeding under chapter 13 of the Bankruptcy Act. (US Code, tit 11, § 1301 et seq.) Thereafter an internal memorandum in a printed form was issued by Baretz to Dorf indicating that a loan for the client would be impossible; the reason usually given for the failure to obtain new financing was the existence of the pending foreclosure action. At this point the client was notified of the failure of respondents to obtain financing and an appointment was made for the client with a “consumer specialist”. The “consumer specialist” was in fact either a single practitioner or a law firm which had been selected by respondents. In the majority of referrals, the attorneys involved filed petitions in the Bankruptcy Court pursuant to chapter 13 of the Bankruptcy Act. In all cases the attorneys charged a fee for the services rendered; these fees were separate and apart from the fee charged by respondents for their services. With one law firm, Salzman, Ingber and Winer, respondents entered into a referral agreement and for the period covering June, 1980 through and until July, 1981 when Midland, Baretz and Dorf ceased operation, the law firm received approximately 115 clients referred from respondents.
The Attorney-General has alleged that the representations of Midland, Baretz and Dorf with regard to their ability to obtain financing to stop the foreclosure actions were fraudulent and designed to induce distraught consumers into entering into a contract and paying a fee to *206 respondents. It is further alleged that respondents were well aware of the creditworthiness of their clients and that the possibility of obtaining additional financing would be remote indeed. Thus the only “service” which respondents could offer to their clients was referral to counsel for the institution of a proceeding in the Bankruptcy Court. It is the position of the Attorney-General that the activities and misrepresentations of the respondents constitute little more than the unauthorized practice of law in violation of section 495 of the Judiciary Law and the improper solicitation of business for an attorney in violation of section 476-b of the Judiciary Law. In this proceeding the Attorney-General seeks to enjoin respondents from engaging in the business of mortgage foreclosure consulting, from referring clients to attorneys and also to make restitution to its clients.
At this point, the court notes that the investigation into the activities of respondents was undertaken not only upon the complaints of numerous former clients[4] of Midland, but also upon the complaint of a Judge of the Bankruptcy Court for the Eastern District of New York, as well as the United States Trustee for the Southern District of New York. The papers in support of the petition include transcripts of bankruptcy proceedings, decisions in bankruptcy cases involving clients of respondents and numerous affidavits from'those clients. These documents all tell a common tale: respondents lured clients into contracts in the vain hope of obtaining loans and after payment of a fee the client was simply referred to an attorney. In opposition Baretz has submitted an affidavit setting forth two defenses: first, that an injunction need not issue as respondents ceased business activity in July, 1981 and second, that no cause of action was pleaded against Baretz and Dorf individually. Neither position is well taken. Voluntary discontinuance of improper or illegal activity is no assurance that such activity will not be resumed. (Matter of State of New York v Person, 75 Misc 2d 252.) Further, even if the court were to credit respondents’ representations *207 with regard to future activity, an order granting injunctive relief would not harm respondents and could be properly granted. (Benco Int. Importing Corp. v Krooks, 53 AD2d 536; Benco Int. Importing Corp. v Wilborn, 64 AD2d 571.) Thus if petitioner can establish the traditional basis for injunctive relief, an injunction may issue. As to the second point urged by respondents, this is predicated on a misreading of the petition. Paragraph 6 of the verified petition sets forth in part: “(respondent Midland, Baretz and Dorf are hereinafter collectively referred to as ‘MEI’)”. Thus the causes of action stated against MEI also state claims against Baretz and Dorf individually. In addition the petition and supporting papers set forth a basis upon which the court may pierce the corporate veil and hold the officers and principals of Midland personally liable. (Matter of State of New York v Daro Chartours, 72 AD2d 872.)
The remainder of the Baretz affidavit attempts to establish triable issues with regard to the nature and quality of the services provided by respondents; appended thereto are copies of unsworn letters and indorsements from presumably satisfied customers. However respondents have failed to establish, by proof of an evidentiary nature, the existence of a triable issue. The affidavit of Baretz is conclusory, self-serving and in fact avoids the central issues raised by the petition. Respondents have been charged with the unauthorized practice of law and the operation of an improper legal referral service. In response Baretz argues that many of his clients were satisfied and that the loss of some homes in foreclosure proceedings was actually the fault of Salzman, Ingber and Winer and not respondents. The existence of satisfied customers in no way excuses violations of the Judiciary Law; similarly respondents may not insulate themselves from liability by charging someone else with incompetence. The papers, affidavits and documents submitted in support of the petition clearly establish that behind the facade of a mortgage consulting service respondents operated an improper referral service and received fees far in excess of the value of the “service” provided. (Matter of Lefkowitz v Peska Assoc., 90 Misc 2d 59; People v Schneider, 20 AD2d 408; People v Meola, 193 App Div 487.) In essence respondents acted in the capacity *208 of a broker: finding the clients, generating a fee and then placing their clients with an attorney. (See State of New York v Abortion Information Agency, 69 Misc 2d 825, affd 37 AD2d 142.) Nothing submitted in opposition by respondents establishes any evidentiary fact to vary this conclusion.
The failure of respondents to meet their evidentiary burden thus warrants a summary determination and the granting of a judgment in favor of the petition. (CPLR 409, subd [b]; State of New York v Princess Prestige Co., 42 NY2d 104, supra; Matter of State of New York v Daro Chartours, supra.) As was indicated by the Court of Appeals in the Princess Prestige case, the court in Special Term may, in its discretion, direct the restitution of money to the affected consumers. The court is convinced that such an order should issue in this case. While the issue of the value of services rendered may ordinarily present an issue of fact, here the fees were generated by conduct and activity violative of the Judiciary Law; the “service” provided by respondents was one which is available free of charge to consumers from local Bar Associations, advertising, and word of mouth. Thus the court finds the services rendered by respondents to be valueless and directs that full restitution be made to the affected consumers. Respondents have admitted to receiving in excess of $170,000 from clients; this money shall be used to reimburse the clients. The judgment to be settled hereon shall provide for the creation of a fund to insure repayment to the clients of respondents. If so advised, petitioner may move for the appointment of a receiver for Midland and to administer this fund.
Accordingly, the petition of the State of New York is granted and petitioner shall have judgment permanently enjoining respondents Midland Equities of New York, Inc., Robert Baretz and Shirley Baretz also known as Shirley Dorf from engaging in the business of mortgage foreclosure consultation, from offering legal advice to consumers and from soliciting business for attorneys. Respondents are also directed to make restitution to their clients in accordance with this decision. Petitioner shall also recover costs in the amount of $2,000 from respondents. (CPLR 8303, subd [a], par 6; Matter of State of New York v Daro Char- *209 tours, supra.) Settle judgment with recommendations for the administration of the fund and the procedures for restitution.

. Subsequent to submission and while the petition was sub judice the Attorney-General entered into a settlement with the law firm of Salzman, Ingber and Winer and the members thereof. Pursuant to the terms of the settlement the action as to the law firm was severed and a consent judgment was entered into discontinuing the action as against those respondents; the caption has been amended to reflect the effect of this settlement.

. In approximately 19 months of operation for some 275 clients, respondents obtained a loan for only one client.

. The consumer affidavits annexed to the petition make it clear that the respondents exclusively used the term “consumer specialist” when referring to the attorneys involved.

. The Attorney-General has annexed affidavits and transcripts from 37 clients complaining of the activities of respondent. This number certainly satisfies any numerosity requirement. (State of New York v Princess Prestige Co., 42 NY2d 104.)