**In re Louis FLEET, Debtor.**

**Louis FLEET, Sarah Morrison, Philadelphia Unemployment Project on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**UNITED STATES CONSUMER COUNCIL, INC., Jack Rhode, Betty Rosi, Deborah Tavares, Defendants.**

**Bankruptcy No. 81–04969S.
Adv. No. 83–0880S.**

United States District Court,
E.D. Pennsylvania.

Jan. 11, 1989.

**322**

Henry J. Sommer, Dina Schlossberg, Gary Klein, Community Legal Services, Inc., Philadelphia, Pa., for debtor/plaintiffs.

Edward Sparkman, Philadelphia, Pa., for Chapter 13 Standing Trustee.

Barry J. Hockfield, Hockfield, Hasner & Weiss, P.C., Cherry Hill, N.J., for defendants.

## ORDER

JOHN P. FULLAM, Chief Judge.

AND NOW, this 11th day of January, 1989, upon consideration of the Opinion containing Proposed Findings of Fact, Conclusions of Law and Recommendations of Bankruptcy Judge of December 8, 1988, it. is hereby ORDERED AND DECREED as follows:

1. The Recommended Opinion and Proposed Findings of Fact and Conclusions of Law are ADOPTED by this court.

2. Judgment is entered in favor of the Plaintiff class and against Defendants UNITED STATES CONSUMER COUNCIL, INC. and JACK RHODE (hereinafter "the Defendants"), and in favor of Defendants BETTY ROSI and DEBORAH TAVARES.

3. The Defendants are determined to be liable to each member of the Plaintiff class in an amount equal to three times any amount paid by each member of the plaintiff class to the Defendants. The precise amounts of liability of the Defendants to each class member are to be determined by the bankruptcy court hereinafter in separate proceedings.

4. The Defendants are hereby enjoined from engaging in the following activities:

a. Providing counsel, advice, or recommendations concerning the laws of debtor-creditor relationships or of bankruptcy.

b. Providing counsel, advice, and recommendations with respect to the preparation by the debtor of bankruptcy petitions, statements and schedules or other legal pleadings.

c. Preparing or filing, either directly or indirectly, for any debtors of Chapter 7 or Chapter 13 petitions, statements, schedules or and Chapter 13 plans.

d. Soliciting clients for the purpose of providing the services referred to in paragraphs 4a through 4c above.

e. Misrepresenting the services that they can and will provide to consumers through either oral representations or any form of advertisement.

f. Using any emblem or insignia resembling the Great Seal of the United States or otherwise indicating an affiliation with the government.

g. Collecting of any fee in connection with services provided to consumers which is grossly in excess of the fair market value of the services provided.

5. The parties are directed to confer to resolve the issue of attorney's fees due to the Plaintiffs' counsel, but, if they are unable to do so, and the Plaintiffs have made a reasonable demand, the Plaintiffs' counsel is accorded an opportunity to file a Motion in the bankruptcy court requesting attorney's fees and costs, including compensation on the fee application, if such is necessary, per 15 U.S.C. § 1692k(a)(3) and 73 P.S. § 201–9.2(a), within thirty days of the Order of the District Court approving this Proposed Order, said Motion to be procedurally in conformity with *In re Meade Land and Development Co., Inc.,* 527 F.2d 280 (3d Cir.1975); and *In re Mayflower Associates,* 78 B.R. 41 (Bankr.E.D. Pa.1987).

OPINION CONTAINING PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND RECOMMENDATIONS OF BANKRUPTCY JUDGE

(Dated Dec. 8, 1988)

DAVID A. SCHOLL, Bankruptcy Judge.

## A. INTRODUCTION

The instant adversary proceeding, certified as a class action, has been pending in this court for over five and a half years and is finally ready for a substantially-final disposition. The proceeding was initiated to attack the practices of the United States Consumer Council (hereinafter referred to as "USCC") and was brought against USCC and several individuals allegedly associated with it alleging that USCC was engaged in a variety of unfair and deceptive acts and practices in violation of the New Jersey law prohibiting unfair and deceptive acts and practices, N.J.S.A. 56:8–1, et seq. (hereinafter "NJ UDAP").[1] The exact nature of the services advertised and provided by USCC is hotly disputed by the parties. The Defendants maintain that USCC attempted to negotiate payment plans with its clients' creditors, and, if all else failed, referred clients to an attorney to file a bankruptcy. The Plaintiffs maintain that the Defendants were operating nothing more than a grossly over-priced lawyer referral service soliciting and referring financially distressed consumers to designated attorneys to file Chapter 13 bankruptcies and that no other services or alternatives were presented to consumers contacting USCC. The Plaintiffs further maintain that USCC only referred clients to attorneys with whom it had some sort of referral agreement and who paid USCC for such referrals.

The Plaintiffs argue that the conduct of the Defendants was unfair and deceptive in a number of respects. For the reasons discussed below, we hold that USCC did misrepresent the nature of its organization and the services that it provided and that its fees were unconscionable in light of the services that were in fact provided by it. We find that the conduct of USCC and its chief operating officer, JOHN RHODE, a/k/a JACK RHODE (hereinafter "Rhode"), was fraught with unconscionable commercial practices in violation of NJ UDAP. In addition to enjoining the Defendants from engaging in such deceptive practices and ordering that the Plaintiffs be reimbursed for any fees paid to USCC, we award Plaintiffs treble damages and attorney's fees under NJ UDAP. N.J.S.A. 56:8–19.[2]

## B. PROCEDURAL HISTORY

The present action was instituted in a Complaint filed on March 31, 1983. The Plaintiffs alleged therein that the Defendants had, through their operation of USCC, committed acts which constituted unfair and deceptive acts and practices in violation of NJ UDAP and the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1, et seq. (hereinafter "PA UDAP"), and that the Defendants had charged undisclosed fees in connection with representation of debtors in bankruptcy proceedings in violation of 11 U.S.C. § 329. The Plaintiffs requested class certification and injunctive and declaratory relief, as well as damages and attorney's fees.

The claims between these parties have been the subject of four reported Opinions to date, all involving USCC and Rhode. In

---

**1.** The parties have stipulated that New Jersey law applies to all aspects of the present case. We believe that this conclusion is appropriate under the applicable Pennsylvania choice of law principles. *See Jones & Laughlin Steel Corp. v. Johns Manville Sales Corp.,* 626 F.2d 280, 283–84 (3d Cir.1980); *In re Koresko, Koresko v. Chase Manhattan Financial Services, Inc.,* 91 B.R. 689, 694 n. 1 (Bankr.E.D.Pa.1988); and *Griffith v. United Airlines,* 416 Pa. 1, 203 A.2d 796 (1964). This conclusion might otherwise be questiona-

ble with respect to those class members who contacted the Washington, D.C. office. However, we believe that reference to the applicable law of the District of Columbia, which appears at D.C.CODE ANN. § 28–3901 et seq. (hereinafter "DC UDAP"), as we will note throughout, would lead to the same result.

**2.** We would have reached the same result under DC UDAP. *See* D.C.CODE ANN. § 3905(k).

the first, on October 15, 1985, our predecessor, the Honorable William A. King, Jr., denied the Defendants' Motion to Dismiss the Complaint for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a cause of action upon which relief can be granted. *In re Fleet*, 53 B.R. 833 (Bankr.E.D.Pa.1985) (hereinafter *"Fleet I"*). In denying the Defendants' Motion, Judge King concluded that the allegations of Plaintiffs' Complaint, if proven, would establish an abuse of the bankruptcy court system. *Id.* at 839. He also determined that this proceeding was "non-core" and "related" to the Debtors' bankruptcy case, rendering it necessary for us to submit proposed findings of fact and conclusions of law to the district court herein. *Id.* at 838–40. *See* Bankruptcy Rule (hereinafter "B.Rule") 9033(a). In *Fleet v. United States Consumer Council, Inc.*, 70 B.R. 845 (E.D.Pa.1987) (hereinafter *"Fleet II"*), the District Court on March 3, 1987, adopted, for the most part, our Recommendation that the Defendant's belated Motion to set aside a default judgment which had been entered against USCC and Rhode should be denied. The plaintiff class was conditionally certified in a decision of August 18, 1987, found at *In re Fleet*, 76 B.R. 1001 (Bankr.E.D.Pa.1987) (hereinafter *"Fleet III"*). The conditional nature of this class certification was based upon our concern over the potential difficulty of identifying and administering relief to members of the plaintiff class. As a result, the Plaintiffs were directed to submit their proposal for addressing the unnamed parties' claims, *id.* at 1012–13, which they subsequently proceeded to do. We also held that, due to the Plaintiffs' delay in moving for class certification, the default judgment would apply to only the named Plaintiffs. *Id.* at 1007–08. Defendants Rhode and USCC and Rhode's wife Lorraine were also defendants in a separate adversary brought by the present plaintiff class in which the District Court adopted our recommendation to set aside, as fraudulent transfers to avoid the potential judgment of the Plaintiffs, conveyances of the Rhodes' present home from USCC to both Rhodes to Lorraine Rhode only. *In re*

*Fleet*, 89 B.R. 420, 421 (E.D.Pa.1988) (hereinafter *"Fleet IV"*).

The tortuous procedural history in this case is recited in *Fleet II*, 70 B.R. at 846–50, and *Fleet III*, 76 B.R. at 1003–05, through August 18, 1987, and will not be reiterated here. After our Opinion and Order of August 18, 1987, the Plaintiffs submitted their proposal for identifying class members, and both parties filed cross-motions for reconsideration of our Opinion regarding class certification. These Motions were denied, and we found the Plaintiffs' proposals adequate, resulting in an Order of October 1, 1987, that this matter could be maintained as a class action pursuant to Federal Rule of Civil Procedure (hereinafter "F.R.Civ.P.") 23(b)(3). At that time, we also established a discovery schedule and scheduled the matter for trial on June 14, 1988. On October 21, 1987, the Defendants filed the long-awaited Answer to the class action Complaint.

Subsequent to our Order of October 1, 1987, the court was called upon to consider a number of discovery disputes, mainly involving the Plaintiffs' efforts to locate class members through the attorneys who accepted referrals from USCC. On May 25, 1988, we granted the Plaintiffs' unopposed motion to bifurcate the trial and limited the proceedings on June 14, 1988, to trial of issues of liability, postponing consideration of potential individual damages to be awarded to class members. The matter did proceed to trial on June 14 and 17, 1988. After a brief extension of the briefing schedule established in an Order of June 10, 1988, the Plaintiffs submitted their trial Brief on September 6, 1988, and the Defendants submitted theirs on October 18, 1988. The Plaintiffs declined the opportunity afforded them in the Order to submit a reply brief.

As this is a non-core proceeding, we are obliged to submit proposed findings of fact and conclusions of law to the district court. Our specific Findings of Fact follow. Our Conclusions of Law are discussed under headnotes reciting each Conclusion.

## C. FINDINGS OF FACT

1. USCC was established in 1980 and is a corporation, registered in New Jersey.

2. USCC began doing business from a Moorestown, N.J., office in 1980. This office was subsequently relocated in Camden, N.J. Offices were also opened in Newark, N.J., in April, 1982, and in Washington, D.C., in July, 1982. The home office in Camden shared space and staff with a real estate business owned and operated by Rhode.

3. The Newark and Washington offices were closed in January, 1983, and the Camden office stopped seeing clients in February, 1983, and closed in March 1983.

4. While USCC has not been actively engaged in business since 1983, USCC has not been dissolved and still exists as a corporate shell.

5. Rhode was the founder and, at all times, the president and sole shareholder of USCC. In addition, Rhode was responsible for the overall operation of USCC, including the training and supervision of all USCC employees. In addition, he was in charge of all marketing and advertising.

6. Defendant DEBORAH TAVARES appears to have been an employee of USCC who met with some of the Plaintiffs at the USCC offices.

7. No evidence was presented regarding the identity of Defendant BETTY ROSI or her role in the operations of USCC.

8. Rhode was licensed as a real estate broker in New Jersey. Apart from his education and experience as a real estate broker, Rhode had no training or experience in consumer financing, bankruptcy, real estate foreclosures, consumer counseling, or other legal matters.

9. None of the employees of USCC had any training in consumer counseling other than as provided by Rhode.

10. Rhode and all of the other USCC employees were not qualified to provide legal advice regarding bankruptcies.

11. Nineteen (19) members of the plaintiff class (hereinafter "the Consumers") testified at the trial. Each of the Consumers had contacted USCC seeking assistance between late 1980 and early 1983. At the time that they had contacted USCC, each of the Consumers had been facing serious financial difficulties, usually due to unemployment, illness, or marital separation.

12. The majority of the Consumers testified that they were in arrears on mortgage payments and that foreclosure proceedings had been instituted or were being threatened against them when they contacted USCC. Sheriff sales of the homes of several of the Consumers had been scheduled before they learned of USCC. Most of the Consumers expressed a fear of losing their homes, and contacted USCC to prevent such a loss.

13. The Consumers learned of the existence of USCC through newspaper, television, and radio advertisements. In addition, USCC sent direct mail solicitations to persons whose homes were scheduled to be sold at sheriff's sale.

14. USCC radio and television ads, of which a video presentation was shown at trial, indicated that USCC was a "financial counseling service" that could help consumers to "consolidate and erase almost any debt" and could arrange home mortgages and other refinancing. The advertisements also indicated that USCC could help stop sheriff's sales and repossessions. At least one of USCC's newspaper ads indicated that a customer's "initial consultation" was free.

15. Business cards for USCC indicated that they were involved in refinancing, second mortgages, business loans, and wage earner plans for Chapter 13 bankruptcies.

16. In the beginning of its operations, USCC used a circular emblem which resembled the Great Seal of the United States. The emblem contained an American eagle with stars and stripes across its chest clasping a sheaf of arrows in one talon and an olive branch in the other. This emblem was used on the USCC stationery, business cards, and client agreements and was displayed on the walls and doors of the USCC's office.

17. Sometime in late 1981, USCC discontinued use of the eagle emblem at the request of the Burlington County, New Jersey Office of Consumer Affairs (hereinafter "OCA"). The eagle emblem was replaced with a logotype which included a knight in armor, shield in hand, with the inscription "Champion: A person who fights for another or for a cause; defender; protector; supporter."

18. USCC refused to discontinue including "United States" in its name, though requested to do so by the Burlington OCA.

19. The majority of the Consumers who testified indicated that they believed that USCC was a government agency or was affiliated with the federal government. Reasons given for this belief were the use of the name: "United States Consumer Council;" the use of the eagle emblem; and the fact that the USCC offices were located near other governmental agencies.

20. Many of the Consumers who contacted USCC did so to arrange to have their bills "consolidated" and a repayment plan negotiated with their creditors.[3] Those Consumers facing mortgage foreclosure contacted USCC to stop the foreclosure and save their homes.

21. The Consumers who contacted USCC were scheduled for an appointment at a USCC office. They were advised when they called or at the time of their appointment to bring in a fee and copies of their bills and deed.

22. The Consumers were told, when they called or came in for their appointments, that USCC could "help them" or "solve their problems" and that USCC could "consolidate" their bills. The consumers generally understood this to mean that USCC would negotiate payment agreements whereby their creditors would accept lower monthly payments.

23. USCC charged the Consumers fees ranging from $195.00 to $260.00. Some Consumers were also charged additional amounts by USCC for "filing fees" or were asked to bring in mortgage payments which many of the Consumers testified were never, in fact, sent to their mortgage company.

24. The Consumers were advised that they had to pay the fee to USCC before USCC would help them with their financial problems.

25. Some of the Consumers were advised that the fee paid to USCC was "to get the process started" or a "good faith payment to creditors" or for a "title search and survey." In fact, none of these fees were paid to the Consumers' creditors or for a title search.

26. The Consumers usually came to the USCC offices for but one appointment with a USCC employee. The appointment usually lasted approximately twenty minutes and the USCC employee took notes during their conversations. A few of the Consumers reported that the USCC interviewer with whom they met did not look at their bills or take any notes of their conversation.

27. During the USCC interview, the interviewer gathered information about the Consumer's bills and discussed Chapter 13 bankruptcies generally. No "counseling" of consumers occurred during the course of these interviews.

28. Those Consumers who were eligible thereafter were never advised of the possibility of seeking an assignment of a mortgage insured by the Federal Housing Administration to the United States Department of Housing and Urban Development (hereinafter "HUD"), under the Mortgage Assignment Program.[4] Disabled consum-

---

**3.** One Consumer, Mary Herriott, testified that she only wanted USCC to arrange with her mortgage company to accept her mortgage payments, as she had all of the money needed to bring her payments current. However, after taking $614.00 from her in addition to the $250.00 fee, USCC referred her to its Newark attorney to file a Chapter 13 bankruptcy anyway.

**4.** See Armstead v. United States Dep't of Housing & Urban Development, 815 F.2d 278, 279–83 (3d Cir.1987); and In re Zaidi, 78 B.R. 410, 411–12 (Bankr.E.D.Pa.1987), for a description of this program, set forth at 24 C.F.R. § 203.650, et seq. In fact, the mortgage of LOUIS FLEET, the original named plaintiff, was ultimately assigned to HUD after he contacted his present counsel. Fleet I, supra, 53 B.R. at 836.

ers were not advised to apply for credit disability benefits or other financial assistance that may have been available to them. Consumers were not advised of the availability of free legal assistance from local legal service programs, nor were they advised of the availability of free lawyer referral services operated by local and state bar associations. Rhode testified that he was not aware of any of these programs, or of any federal or state programs available to help people with foreclosure problems, and therefore, it is unlikely that any employees of USCC were aware of them, or advised the Consumers about them.

29. The Consumers who retained the services of USCC signed an agreement which contained a disclaimer stating that USCC is "not a governmental agency." Rhode testified that this disclaimer was included in the contract to prevent clients from "misconstruing" the "United States" in USCC's name as indicating an affiliation in some way with the federal government.

30. The agreement provides that the consumer was retaining USCC as "exclusive financial consultant" for the "express purpose of arranging for a possible resolution of client's financial condition." The agreement further provides for payment to USCC of a non-refundable fee.

31. At the conclusion of the interview and after payment of the USCC's fee, the Consumers were advised that a bankruptcy was the only means for them to effectively deal with their financial problems. The Consumers were then advised that they would be referred to one of USCC's lawyers to file a bankruptcy. Some of the Consumers reported that they were told that they were being referred to attorneys who would "handle" their problems without being told that they were being referred there to file a bankruptcy.

32. Only Georgia Davis of the nineteen Consumers indicated that USCC had attempted any sort of negotiations with her creditors. All of the other consumers were referred to a USCC lawyer at or soon after their interview. Even with respect to Ms. Davis, no repayment plan was entered into

and she too was referred to an attorney for bankruptcy on her third visit.

33. According to all of the Consumers, with the possible exception of Ms. Davis, apart from the interview and the referral to the attorney, USCC did nothing else on their behalf.

34. USCC did not stop sheriff sales or repossessions.

35. USCC referred all of its customers from southern New Jersey and Philadelphia, to David P. Daniels, Esquire, to file bankruptcies. Customers from northern New Jersey were referred to Dean Sutton, Esquire, and customers in the Washington, D.C. area were referred to Charles Broida, Esquire, also to file bankruptcies. (Hereinafter these attorneys are referred to individually or collectively as "the referral attorney(s)"). Consumers were not given a choice of which attorney to go to see.

36. Some of the Consumers stated that they were advised that they were being referred to "their," i.e., USCC's attorney. Many of the Consumers reasonably assumed that the referral attorneys were employees of or in some way affiliated with USCC.

37. Some of the Consumers were advised by USCC that the fee they paid to USCC would be credited toward the referral attorney's fee. Others simply assumed that the fee would be so credited.

38. It appears that the referral attorneys filed Chapter 13 bankruptcies on behalf of each of the Consumers who was referred to them by USCC.

39. After being sent there by USCC, the Consumers met with the referral attorneys. The attorney generally did not have any background information regarding them, although, on some occasions, it appeared that the referral attorney did have the financial information previously provided to USCC.

40. When they were sent to the referral attorney, the Consumers were advised to bring an amount equal to one mortgage payment or a minimum of $300.00 (for consumers who did not have a mortgage) and a $60.00 filing fee. The Consumers indi-

cated that, to the best of their knowledge, the "mortgage payments" that they paid to the referral attorney were never paid to their respective mortgage companies.

41. The Consumers testified that the referral attorneys charged fees for their services in handling their bankruptcies ranging from $400.00 to $1,500.00. None of the Consumers were given credit for any amounts previously paid to USCC by the referral attorneys.

42. Many of the Consumers indicated that they were greatly dissatisfied with the services provided by USCC and indicated that they felt they had been charged $195.00 to $260.00 simply to be referred to a lawyer.[5] It appears that if these consumers had known in advance what services would or would not be provided by USCC that they would not have agreed to pay the fee.[6]

43. The testimony of the Consumers was consistent regarding their experiences with USCC and was very credible. The Consumers were candid regarding their recollections, and appeared to have good recall of the details, even though the events had occurred over five years before the trial. Their demeanor, as a whole, was totally uncontrived. The Consumers impressed the court as a group of average consumers who felt that they had been cheated by USCC.

44. Patricia Tuck, Director of the Camden County, New Jersey OCA, also testified in this matter on behalf of the Plaintiffs. Her agency had conducted an investigation of the operations of USCC after receipt of consumer complaints similar to those expressed by the Consumers here. According to complaints received by OCA, Rhode and other USCC employees had advised consumers that USCC was a federal program and that their credit would not be effected by filing for a Chapter 13 bankruptcy or could be re-established within six

months of filing such a bankruptcy. Such statements would, of course, have not been true.

45. On April 22, 1983, Tuck participated in a meeting between Rhode and representatives of the New Jersey Office of Consumer Protection (hereinafter "NJ OCP"). Discussed at that time were concerns of the NJ OCP that the USCC name simulated a governmental agency and that USCC advertisements inferred that USCC possessed the ability to stop foreclosures and repossessions. Rhode advised the NJ OCP that USCC had ceased operations as of March 31, 1983; agreed to reimburse the fees paid by all known USCC customers; and agreed to set up an escrow account for unknown customers in an amount to be decided by the NJ OCP. No reimbursements or establishment of an escrow account or fund were ever accomplished.

46. The only witness for the Defendants was Rhode. No "satisfied" customers, nor other former employees of USCC were called to rebut the Plaintiffs' evidence.

47. Rhode's testimony contradicted that of the Consumers in several respects, most notably regarding the services provided by USCC. Rhode testified that USCC attempted to establish a repayment agreement with all of its clients' creditors. According to Rhode, USCC initially wrote to the creditors and followed up its letters within a week. He stated that it was only if these efforts were unsuccessful that USCC would refer a client to an attorney for a bankruptcy. Rhode testified that all USCC clients were advised that letters would be sent to their creditors and that all of the Consumers who testified that they were not advised of such services were "in error." Rhode did admit that re-payment agreements were rejected by creditors or

---

5. Larry McCray testified that he already belonged to a lawyer referral service and therefore did not need USCC to be referred to an attorney.

6. The dissatisfaction of the consumers is perhaps best expressed in their own words. Ethel Barksdale testified that the USCC interviewer "promised to help me, but referring me to a

lawyer. I don't really consider that help because a phone book could have really done that." Walter Kwityn indicated that he thought "its a little bit steep to be charged two hundred and fifty dollars just to tell you that, you know, this gentlemen will be your lawyer."

were not feasible for the majority of USCC clients.

48. Rhode provided the Camden OCA with copies of forms utilized by USCC. Included among these forms were blank Chapter 13 Statement forms with David P. Daniels' name typed in as attorney for the debtor. At trial in this matter, however, Rhode denied use of these forms, indicating instead that USCC had transposed the questions from the Chapter 13 Statement onto another sheet of paper which was used during the interview and was provided to Daniels for the sake of "continuity."

49. We find, however, that USCC employees were, at least in some cases, using the Chapter 13 Statements during the interviews with consumers. We believe that Rhode was unwilling to admit this practice in light of allegations that USCC was engaged in the unauthorized practice of law. Excluded from the forms provided to the Camden OCA were any of the letters which were purportedly sent to clients' creditors, which suggests to us that such letters and services were non-existent.

50. Rhode's testimony lacked the candor and sincerity of that of the Consumers. A particularly doubtful element of Rhode's testimony concerns his contentions regarding payments made to him by Daniels. Admitted into evidence were a number of checks made payable from Daniels to USCC. These checks were written over a period from December, 1981, through March, 1983, and totalled $109,223.30, an average monthly payment of approximately $6,826.46. Rhode claimed that this was compensation for appraisals of the homes of USCC clients done in connection with their bankruptcies and for completion, by USCC, of the bankruptcy questionnaires that were provided to Daniels. We believe that it is most unlikely that such appraisals would be needed for all or most of the clients referred to Daniels. If these services were performed by Rhode personally, there is no reason why the payments were made to USCC. In addition, many of the Consumers testified that when they visited the referral attorney, that attorney had no background information on them whatsoev-

er. We therefore disbelieve that such appraisals were the reason for the payments and that, in fact, these payments were referral fees paid to USCC from Daniels.

51. In addition, Rhode's answers in other areas were often evasive and his manner often defensive. Numerous inconsistencies in his testimony appeared. For example, at depositions entered into evidence in this matter, Rhode indicated that he was unable to recall the last names of any of his employees at USCC. In defense of his poor memory, Rhode indicated that his employees were "minimum wage type" who never stayed long. At later trials, however, Rhode admitted that his brother and his children were among his employees and he denied that his employees were usually "minimum wage" employees. We simply do not believe that USCC's business method was as he portrayed it, but that it was fraught with misrepresentation, as the Consumers portrayed it. Thus, we conclude here, as we have in other matters, that Rhode generally lacks credibility. *See Fleet II*, 70 B.R. at 849; and *Fleet IV*, 89 B.R. 426.

## D. CONCLUSIONS OF LAW

I. THE RECORDS OF THE OCA'S AND THE NJ OCP WHICH WERE OFFERED INTO EVIDENCE BY THE PLAINTIFFS ARE ADMISSIBLE UNDER THE BUSINESS RECORD EXCEPTION OF THE HEARSAY RULE SET FORTH IN 803(6)

Initially, we must decide the admissibility of certain documents offered by the Plaintiffs in support of their case and objected to by the Defendants. These documents include: (1) A Complaint Form completed by a consumer-client of the Camden County OCA relating to USCC which had been submitted to it; (2) An OCA record of a complaint filed by a consumer against USCC; (3) A letter from the Director of the Burlington County OCA to an attorney regarding consumer complaints against USCC; (4) A letter from Daniels enclosing an agreement between USCC and a customer that was provided to USCC by the customer; and (5) A memorandum from the

NJ OCP describing a meeting with Rhode and his attorney.[7] The Defendants objected to these documents on the ground that they were each inadmissible hearsay. The Plaintiffs maintain that these exhibits are admissible as exceptions to the hearsay rule pursuant to Federal Rule of Evidence (hereinafter "FRE") 803(6) relating to business records and FRE 803(8)(C) relating to public records.[8]

■ We conclude that FRE 803(8)(C) is not applicable here, since that Rule pertains only to admission of factual findings resulting from an investigation conducted pursuant to law. While the NJ OCP may have been investigating USCC, none of the contested documents contain factual findings resulting from such investigation. *Compare In re Japanese Electronic Products*, 723 F.2d 238, 264 (3d Cir.1983); and *Lloyd v. American Export Lines, Inc.*, 580 F.2d 1179, 1182–83 (3d Cir.1978). Thus, the present case is distinguishable from *In re Gulph Woods Corp.*, 82 B.R. 373 (Bankr.E.D.Pa.1988), where we admitted, under FRE 803(8)(C), State Ethic Commission Orders containing factual conclusions which were issued after a formal hearing by that body.

However, FRE 803(6) provides for the admissibility of business records or data made from information transmitted by a person with knowledge thereof, if the record is kept in the regular course of business. The Plaintiffs maintain that the internal records of the OCA's and the NJ OCP relating to their investigation are admissible so long as there are sufficient

circumstances to indicate the trustworthiness of such documents. *See United States v. Central Gulf Lines, Inc.*, 575 F.Supp. 1430 (E.D.La.1983). *See also* 5 WIGMORE ON EVIDENCE, § 1561(b) (Chadbourn rev.1974). Defendants maintain that the proferred records are not admissible business records since they were not prepared by employees of the OCA offices. *See Johnson v. Lutz*, 253 N.Y. 124, 170 N.E. 517 (1930). *See also* McCORMICK ON EVIDENCE, § 310, at 878–880 (3d ed. 1984); FRE 803, Advisory Committee Notes to Exception (6). *Compare Lewis v. Baker*, 526 F.2d 470, 472–74 (2d Cir.1975) (railroad company's accident report admissible even though it contained an employees' version of an accident where sufficient indicia of trustworthiness exists); and *Gordon v. Robinson*, 210 F.2d 192, 196–198 (3d Cir.1954) (officer's testimony of records of accident he had not witnessed admissible; the important consideration is whether a business record is derived from an efficient clerical system).

■ We believe that the records offered here are admissible as business records pursuant to FRE 803(6). Despite the conflicting authorities considering the admissibility of business records containing information from an outside source, it seems clear that such records may be admissible where the outsider's statements fall within another exception to the hearsay rule. *United States v. Baker*, 693 F.2d 183, 188 (D.C.Cir.1982); and McCORMICK, *supra*, § 310, at 878–880. To the extent that the

---

**7.** These five documents were marked as Exhibits "P–32," "P–33," "P–35," "P–37," and "P–39," respectively.

**8.** These FRE's provide as follows:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

.    .    .    .    .

(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, *or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity,* and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or

other qualified witness unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit (emphasis added).

.    .    .    .    .

(8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

profered documents may be objectionable as "double hearsay," it appears that, as long as both links in the evidentiary chain fall within exceptions to the hearsay rule, the evidence is not excludable. *See* FRE 805.

█ The Camden County OCA record of a consumer complaint, the second of the five items in issue, appears unobjectionable since it is an internal record produced by the OCA. The information provided by the consumer in the Complaint Form referenced in the first item related to representations made by employees of USCC, which would not be considered hearsay since it related admissions by a partyopponent. *See* FRE 801(d)(2). The third and the fifth items referenced above are simply admissible business records, irrespective of the fact that their "custodian" was not present to testify. *See Mississippi River Grain Elevator, Inc. v. Bartlett & Company, Grain,* 659 F.2d 1314, 1319 (5th Cir.1981) (trustworthy records are admissible under FRE 803(6) even when not introduced through testimony of their custodian). The fourth item, the letter from Daniels to OCA, does not appear objectionable as hearsay since it is not offered to establish the truth of the matters contained therein. *See* FRE 801(d).

The Defendants have not suggested anything about the circumstances of preparation of the proferred documents that would indicate a lack of trustworthiness and this is the key element of FRE 803(6). We note that the New Jersey OCAs and the NJ OCP are not parties to this action and have no bias or interest therein. Their records, as instrumentalities of the state, appear highly reliable. As a result, all of the proferred business records of these agencies will be admitted.

## II. USCC'S MARKETING SCHEME MISREPRESENTED THE SERVICES ACTUALLY PROVIDED BY IT AND CONSTITUTED A DECEPTIVE TRADE PRACTICE IN VIOLATION OF THE NJ UDAP

█ New Jersey, like Pennsylvania and most other American jurisdictions, has enacted legislation which prohibits unfair or deceptive acts and practices utilized in connection with the advertisement and sale of goods and services. *See In re Russell,* 72 B.R. 855, 870 (Bankr.E.D.Pa.1987).[9] The NJ UDAP prohibits, at N.J.S.A. 56:8–2:

[T]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, ...

The NJ UDAP was designed to prevent sellers from overreaching by prohibiting deceptive sales and advertising practices in connection with the marketing of goods and real estate. *See Meshinsky v. Nichols Yacht Sales, Inc.,* 110 N.J. 464, 541 A.2d 1063, 1066 (1988); *Fenwick v. Kay American Jeep, Inc.,* 72 N.J. 372, 371 A.2d 13, 15 (1977); *D'Ercole Sales, Inc. v. Fruehauf Corp.,* 206 N.J.Super. 11, 501 A.2d 990, 996 (App.Div.1985). The Act is remedial and has been liberally construed in favor of protecting consumers. *Barry v. Arrow Pontiac, Inc.,* 100 N.J. 57, 494 A.2d 804, 811 (1985). A violation of NJ UDAP may be established by a preponderance of the evidence. *Hyland v. Aquarian Age 2,000, Inc.,* 148 N.J.Super. 186, 372 A.2d 370, 372 (Ch.Div.1977).

Deception or unconscionability in advertising is gauged by the "capacity to mislead." *Fenwick, supra,* 371 A.2d at 16; *D'Ercole Sales, supra,* 501 A.2d at 996 (App.Div.1985); and *Matter of Shack,* 177 N.J.Super. 358, 426 A.2d 1031, 1034 (App. Div.1981), *certif. denied,* 87 N.J. 352, 434 A.2d 95 (1981). Where the possibility of consumer deception is present, it need not be proven that a consumer has in fact been misled or deceived. *Kugler v. Romain,* 58 N.J. 522, 279 A.2d 640, 648 (1971); *Barry,*

9. We also note the presence of the similar DC UDAP statute, at D.C.CODE ANN. § 28-3902.

*supra,* 494 A.2d at 810; and *Skeer v. EMK Motors,* 187 N.J.Super. 465, 455 A.2d 508, 511 (App.Div.1982). The issue to be resolved is whether an advertisement is misleading to the average consumer, not how it might be understood by a knowledgeable, sophisticated consumer. *Barry, supra,* 494 A.2d at 810; *Chattin v. Cape May Green, Inc.,* 216 N.J.Super. 618, 524 A.2d 841, 852 (App.Div.1987), *cert. denied,* 107 N.J. 148, 526 A.2d 209 (1987). *Cf. FTC v. Standard Educational Society,* 302 U.S. 112, 116, 58 S.Ct. 113, 115, 82 L.Ed. 141 (1937).[10]

Deception under N.J. UDAP is an objective standard based on the probable impact on the average consumer and not upon the subjective intent of the seller. Thus, it is not necessary to prove any bad intent or motive on the part of the seller in order to establish unlawful deception. *Fenwick, supra,* 371 A.2d at 16; and *State v. Hudson Furniture Co.,* 165 N.J.Super. 516, 398 A.2d 900, 901 (App.Div.1979).[11] In fact, a seller's good faith is irrelevant. *Huffmaster v. Robinson,* 221 N.J.Super. 315, 534 A.2d 435, 438 (Law Div.1986); *D'Ercole Sales, supra,* 501 A.2d at 996; and *Skeer, supra,* 455 A.2d at 511. *Cf. In re Andrews,* 78 B.R. 78, 82–83 (Bankr.E.D.Pa. 1987) (same interpretation of PA UDAP). Indeed an advertisement may be deemed deceptive or misleading even though it does not contain false facts. *Shack, supra,* 426 A.2d at 1034.[12]

Applying this standard to the present case, we have no difficulty in concluding that the advertisements of USCC and the representations made by its employees not only had the capacity to, but did, in fact, mislead the financially-troubled consumers who turned to USCC for help. The USCC marketing scheme was fraught with misrepresentations. Contrary to the representations made in their advertisements, USCC could not and did not stop sheriff's sales or repossessions. Contrary to the representations made in its advertisements and on its business cards, USCC could not and did not arrange home mortgages and refinancing. Contrary to the its advertisements, USCC could not consolidate and erase most any debt, and the initial consultation was clearly not free.[13] *Cf. Barry, supra,* 494 A.2d at 812 (use of term "dealer invoice" in automobile advertisement misleading since term had no fixed, ascertainable meaning to the average consumer); *Chattin, supra,* 524 A.2d at 853 (use of term "insulated aluminum windows" could be found misleading to the average consumer when used to describe windows with insulated glass and uninsulated aluminum frames); and *Shack, supra,* 426 A.2d at 1035 (advertisement for contact lenses was deceptive where it failed to indicate that additional professional services not included in the advertised price were required for the vast majority of customers). *Cf. Fen-*

**10.** Cases interpreting the Federal Trade Commission Act (hereinafter "FTCA") note that the law is not made for the protection of experts, but for the general public, which has been defined as "that vast multitude which includes the ignorant and unthinking and the credulous, who, in making purchases, *do not stop to ana*lyze but too often are governed by appearances and general impressions." *Beneficial Corp. v. FTC,* 542 F.2d 611, 618, n. 11 (3d Cir.1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977); *FTC v. Sterling Drug, Inc.,* 317 F.2d 669, 675 (2d Cir.1963); and *In re American Marketing Associates,* 73 FTC 213, 229 (1968). *Compare In re Littles,* 90 B.R. 669, 679–80 (Bankr.E.D.Pa.), *aff'd in part and revised in part sub nom. Crossley v. Lieberman,* 90 B.R. 682; and *Littles v. Lieberman,* 90 B.R. 700 (E.D.Pa. 1988) (standard in Federal Debt Collection Practices Act case is whether an unsophisticated consumer would be injured by particular practice).

**11.** According to the language of NJ UDAP, knowledge and intent are only required where it is alleged that a seller concealed, suppressed, or omitted a material fact in connection with such sale. N.J.S.A. 56:8–2; and *Fenwick, supra,* 371 A.2d at 16.

**12.** Of course, the NJ UDAP applies to oral misrepresentations as well as to written advertisements. *See Chattin, supra,* 524 A.2d at 853.

**13.** All that consumers were told before paying the USCC fee that USCC could "help" them or "solve" their problems. This hardly qualifies as an initial consultation. It was not until the fee was paid that consumers were provided with their only "service," *i.e.,* they were advised that they should file for bankruptcy and were referred to an attorney for that purpose.

*wick, supra,* 371 A.2d at 16 (advertisement for used automobile violates NJ UDAP since it failed to include car's odometer reading as required by state regulation, even though such omission was inadvertent).

In addition to these specific misrepresentations, the USCC marketing scheme misrepresented the nature of the services to be provided. USCC employees and advertisements indicated that USCC would "stop sheriff sales" and "consolidate bills" and "solve" the problems of financially-distressed consumers. The clear implication of these representations was that USCC would take an active role in solving the consumer's financial and related legal problems. This implication is further reinforced by the listing of financial and legal services on the USCC business card, i.e., refinancing, second mortgages, and wage earners plan, which services were not in fact provided by USCC. In addition, the "knight in armor" logotype employed by USCC suggests that USCC will fight for its clients' cause and defend their rights, which it in no sense did.

The images evoked by the USCC marketing scheme are a far cry from the services provided. USCC was in fact little more than a referral service,[14] dispatching clients to mediocre attorneys to defend their rights.

In addition, through their agreements with USCC, the Consumers retained USCC as their "exclusive financial consultant." However, it does not appear that any financial consulting took place.[15] In fact, it is quite clear that Rhode and the USCC em-

ployees that he "trained" lacked the necessary knowledge to provide such services.

The misleading nature of the USCC marketing scheme is confirmed by the fact that the Consumers were misled. They concluded from the advertisements and oral representations that USCC would be doing more than just referring them to an attorney for the fee charged. Many of the Consumers thought that USCC would "consolidate" their debts. Others believed that USCC or its employees would be representing them in their bankruptcy.

While USCC made affirmative misrepresentations regarding the nature of its business and the specific services it provided, it also refused to disclose the true nature of its services, i.e., a referral service, until such time as clients had paid their fee of $195.00 to $260.00. Such a marketing scheme is similar to the type of "bait and switch" advertising generally found by the courts to constitute a deceptive trade practice. *Consumer Products of America, Inc. v. FTC,* 400 F.2d 930 (3d Cir.1968) *cert. denied,* 393 U.S. 1088, 89 S.Ct. 877, 21 L.Ed.2d 781 (1969); and *In re Great Atlantic & Pacific Tea Co.,* 85 FTC 601 (1975). The NJ UDAP specifically prohibits such "bait and switch" practices. N.J.S.A. 56:8–2.2.

The USCC marketing scheme, including advertisements and oral representations, not only had the capacity to, but in fact did, mislead financially troubled consumers regarding the services that USCC provided. The real services provided were not disclosed until the USCC fee was paid. We have no difficulty concluding that this "bait and switch"-type marketing scheme consti-

---

**14.** As we indicated in Findings of Fact 50 and 51, page 329 *supra,* we do not credit Rhode's testimony that USCC attempted to negotiate repayment plans on behalf of all its clients and that all clients were advised of this fact. We do not believe that the eighteen consumers who testified that such services were not provided to them could have all forgotten that this service had in fact been provided to them. We think it significant that, given the weight of testimonial evidence presented by the Plaintiff on this point, the Defendants did not present one witness or document to support the doubtful testimony of Rhode.

**15.** As noted by Judge King in *Fleet I,* 53 B.R. at 839:

It appears that defendants were engaged in a clever scheme to extract monies from financially troubled consumers under the guise of providing bankruptcy "counselling." Not only did plaintiffs pay valuable consideration to non-lawyers with no experience in bankruptcy matter for advice concerning bankruptcy, apparently, plaintiffs did not receive the type of counselling which they would have received if they had consulted true experts in the field.

tuted a deceptive trade practice prohibited by the NJ UDAP.

## III. THE USE OF THE NAME "UNITED STATES CONSUMER COUNCIL," TOGETHER WITH AN AMERICAN EAGLE EMBLEM IMPLIED AN AS-SOCIATION WITH A GOVERN-MENT AGENCY AND CONSTITUT-ED A DECEPTIVE PRACTICE IN VI-OLATION OF NJ UDAP

■ The Plaintiffs also allege that the Defendants violated NJ UDAP by decep-tively simulating an affiliation with the fed-eral government.[16] The NJ UDAP specifi-cally provides, at N.J.S.A. 56:8–2.1, as fol-lows:

> It shall be an unlawful practice for any person to operate under a name or in a manner which wrongfully implies that such person is a branch of or associated with any department or agency of the Federal Government or of this State or any of its political subdivisions, or use any seal, insignia, envelope or other for-mat which simulates that of any govern-mental department or agency.

While there are no reported cases interpret-ing N.J.S.A. 56:8–2.1, it is instructive to consider cases relating to misrepresenta-tion of government affiliation decided un-der the Federal Trade Commission Act (hereinafter "FTCA").[17]

The Federal Trade Commission has con-sidered a number of cases where it was alleged that businesses, through their ad-vertisements or representations, were falsely implying an association with the government in violation of FTCA. The Commission has found deceptive practices where companies have used the words such as "U.S." or "American" in the name of the company, plus emblems which simulate governmental seals. *In re United States Association of Credit Bureaus, Inc.*, 58

F.T.C. 1044 (1968), *modified*, 299 F.2d 220 (7th Cir.1962) (use of "United States" in the company name, together with the use of an insignia with a shield and American Eagle falsely represented connection with federal government); and *In re American Exten-sion School*, 50 F.T.C. 102 (1953) (use of seal with American Eagle similar to Great Seal of federal government implies connec-tion with government). *See also In re The Capitol Service, Inc. et al.*, 51 FTC 198 (1954) (advertisements picturing the capitol building of the federal government held to imply connection with the federal govern-ment).

Cases involving potentially deceptive company names without use of govern-ment-type emblems have not, however, al-ways been found a violation of the FTCA. In *In re Federal Employees Distributing Co., Inc.*, 56 F.T.C. 550, 564 (1959), the F.T.C. adopted the conclusion of the hear-ing examiner that use of the word "Feder-al" standing alone was not *per se* decep-tive, but must be considered in connection with other words connoting governmental involvement. *Accord, In re National Training Service*, 48 F.T.C. 778 (1952) (it is unlikely that a name alone, apart from other representations of governmental con-nection, would mislead the public). *But see United States Association of Credit Bu-reaus, supra*, 58 F.T.C. at 1052 (evidence supports finding that use of name "United States," whether or not used with an insig-nia, has a tendency and capacity to mislead and deceive creditors). However, use of governmental-type company names has been found to be deceptive when accompa-nied by other representations or circum-stances which implied a government con-nection. *Bennett v. F.T.C.*, 200 F.2d 362 (D.C.Cir.1952) (use of company name "Na-tional Service Bureau" with Washington, D.C. address); *National Training Service, supra* (sales representatives used creden-

---

**16.** We note that the DC UDAP also prohibits misrepresentation of sponsorship or affiliation, at D.C.CODE ANN. § 28–3904(a).

**17.** The FTCA prohibits the use of unfair or de-ceptive acts or practices in commerce including the dissemination of false advertisements. 15 U.S.C. §§ 44, 52. The standard for gauging de-ception under the FTCA, like that utilized by

New Jersey courts under the NJ UDAP general-ly, is the tendency or capacity to deceive. *F.T.C. v. Colgate Palmolive Co.*, 380 U.S. 374, 391–92, 85 S.Ct. 1035, 1046–47, 13 L.Ed.2d 904 (1965); *American Home Products v. F.T.C.*, 695 F.2d 681 (3d Cir.1982); *FTC v. Sterling*, 317 F.2d 669, 673 (2d Cir.1963); and *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir.1976).

tials simulating government credentials); and *In re Federal Coaching Institute, Inc.*, 49 F.T.C. 1138 (1953) (advertisements for civil service examination training course implied connection with federal government). *See also F.T.C. v. Army–Navy Trading Co.*, 88 F.2d 776 (D.C.Cir. 1937); *Federal Military Equipment Corp.*, 43 F.T.C. 357 (1943); *Federal Organization, Inc.*, 29 F.T.C. 504 (1939); *Federal Civil Service Training Bureau*, 25 F.T.C. 444 (1937); *Federal Institute of Meats & Marketing*, 24 F.T.C. 199 (1936); and *Federal Bond & Mortgage Co.*, 8 F.T.C. 194 (1924).

We believe that the Defendants' use of the name, "United States Consumer Council," together with the American eagle emblem, definitely had the "capacity to mislead" consumers. In fact, many of the consumers here testified that they believed that USCC was associated with a government agency. This was a violation of the NJ UDAP.

■ We are less inclined to conclude, however, that, once the Defendants discontinued use of the eagle seal, that use of its name alone implied an association with the government.[18] *See In re Federal Employees' Distributing Company*, 56 F.T.C. 550, 565 (1958) (hearing examiner notes that dozens of private concerns use words such as "U.S." and "Federal" in their names, i.e., U.S. Steel). Once USCC discontinued use of its seal, we are not convinced that there were sufficient "other circumstances" to imply a connection with the government.

## IV. THE FEE CHARGED BY USCC CONSTITUTED AN UNCONSCIONABLE PRICE AND A FRAUD IN VIOLATION OF NJ UDAP

■ The NJ UDAP prohibits any "unconscionable commercial practice," as well as deceptive and fraudulent conduct used in the sale or advertisement of merchandise. *D'Ercole Sales, supra,* 501 A.2d at 997; and *Skeer, supra,* 455 A.2d at 511.[19] Thus, in this sense also, a violation of NJ UDAP may be established even in the absence of deceit or fraud. *Meshinsky, supra,* 541 A.2d at 1063; and *Hyland, supra,* 372 A.2d at 372.

While the term "unconscionability" is not specifically defined in either the NJ UDAP or the UCC, it has been characterized as "an amorphous concept obviously designed to establish a broad business ethic." *Romain, supra,* 279 A.2d at 651. Thus, the New Jersey Supreme Court, in *Romain,* concluded that the legislature expected the courts to interpret the concept of unconscionability "liberally so as to effectuate the public purpose, and to pour content into it on a case-by-case basis." *Id.* at 651. *See also Meshinsky, supra,* 541 A.2d at 1067; and *Kugler v. Koscot Interplanetary, Inc.,* 120 N.J.Super. 216, 293 A.2d 682, 691 (Ch. Div.1972). As one commentator noted:

> The Courts have always avoided hampering themselves by defining or laying down as a general proposition what shall be held to constitute fraud. Fraud is infinite in variety. The fertility of man's invention in devising new schemes of fraud is so great, that the courts have always declined to define it, or to define undue influence, which is one of its many varieties, reserving to themselves the liberty to deal with it under whatever form it may present itself.

KERR, FRAUD AND MISTAKE (7th ed. 1952), quoted with approval in *Romain, supra,* 279 A.2d at 651–652, n. 4; and *Koscot Interplanetary, supra,* 293 A.2d at 691.

Despite the amorphous nature of the concept of unconscionability, it has been de-

---

**18.** The establishment of an office by the USCC in Washington, D.C., which otherwise would seem an unlikely expansion of the New Jersey base of USCC, could, under the reasoning of *Bennett, supra,* constitute a sufficient connection with the federal government. However, this office was so short-lived that this factor, though possibly indicating Rhode's intention to have customers make such a connection, never really came to fruition.

**19.** The NJ UDAP was amended in 1971 to include unconscionable commercial practices among its definition of unlawful practices. *D'Ercole Sales, supra,* 501 A.2d at 997. Even prior to that time, however, the New Jersey Supreme court had concluded that an unconscionable contract under Section 2–302 of the Uniform Commercial Code was violative of Section 2 of the NJ UDAP N.J.S.A. 56:8–2. *Romain, supra,* 279 A.2d at 650–54.

fined as establishing a standard of conduct contemplating "good faith, honesty in fact, and observance of fair dealings." *Meshinsky, supra,* 541 A.2d at 1067; *Romain, supra,* 279 A.2d at 652; and *Hyland, supra,* 372 A.2d at 373. As the Court in *Romain* noted, "[t]he need for application of the standard is most acute when the professional seller is seeking the trade of those most subject to exploitation—the uneducated, the inexperienced and the people of low incomes." 279 A.2d at 652.[20] The Uniform Consumer Sales Practice Act (hereinafter "UCSPA") provides that, in determining whether an act or practice is unconscionable, the court should consider, among other factors, whether "the price grossly exceeded the price at which similar property or services were readily obtainable in similar transactions by like consumers." UCSPA, § 4(c)(2). *See D'Ercole Sales, supra,* 501 A.2d at 1000.

The Plaintiffs maintain that the fee charged by USCC was an unconscionable price for the services provided. The seminal New Jersey case on price unconscionability is *Romain.* That case involved the door-to-door sales of so-called educational books for children. 279 A.2d at 641–643. Sales efforts were directed at minority group consumers and consumers of limited education and economic means. *Id.* at 643. The seller was charging between $250.00 and $280.00 for books with a value of about $110.00. *Id.* at 643–644. Evidence was presented that the books sold were of little or no education value to children in the age-group and socio-economic position targeted by the seller. *Id.* at 644–645.

The *Romain* court found the seller's price to be unconscionable, and further held that such price unconscionability constituted a consumer fraud prohibited by NJ UDAP. *Id.* at 654. In so holding, the court reasoned that:

[i]n deciding whether defendant, contrary to the statute, used any deception, fraud,

false pretense, or misrepresentation, or whether he concealed, suppressed or omitted any material fact in connection with the sales to book purchaser, the price charged the consumer is only one element to be consider. If the price is grossly excessive in relation to the seller's costs, and if in addition the good sold have little or no value to the consumer for the purpose for which he was persuaded to buy them and which the seller pretended they would serve, the price paid by the consumer takes on even more serious characteristics of imposition. *Id.* at 644.

We find the facts in the present case to be even more indicative of imposition. The consumers who turned to USCC for help were financially troubled and distraught. Some were unemployed or disabled. Many were facing the loss of their homes through foreclosure. USCC, through its marketing scheme, represented that it could provide help to these consumers, help which USCC could not and did not provide. USCC then charged consumers $195.00 to $260.00 simply for referring them to an attorney. Such a referral could be obtained for free through a bar association lawyer referral service. *See State v. Midland Equities of New York, Inc.,* 117 Misc.2d 203, 458 N.Y.S.2d 126, 129 (N.Y. Sup.Ct.1982).

In light of the circumstances of the present case, we have no difficulty concluding that the fee charged by USCC constitutes an unconscionable price for its services and a fraud in violation of NJ UDAP.

**V. PLAINTIFFS ARE ENTITLED TO RECOVER TREBLE ANY AMOUNTS PAID TO THE DEFENDANTS PLUS ATTORNEYS' FEES UNDER NJ UDAP**

■ The parties suggest that the measure of damages in this case is the differ-

---

**20.** The court in *Romain* recognized that

[t]he deception, misrepresentation, and unconscionable practices engaged in by professional sellers seeking mass distribution of many types of consumer goods frequently produce an adverse effect on large segments of disadvantaged and poorly educated people,

who are wholly devoid of expertise and least able to understand or to cope with the "sale-oriented," "extroverted" and unethical solicitors bent on capitalizing upon their weakness, who therefore most need protection against predatory practices. 279 A.2d at 652.

ence between the USCC fee and the value of the services provided. Plaintiffs maintain that the value of these services was zero. Defendants maintain that the value of their services was equal to the fee.

We disagree with the parties' approach to this issue. We believe that, given the deceptive and unconscionable trade practices found in the present case, any contract between the Plaintiffs and USCC is void and unenforceable and that the Plaintiffs are entitled to reimbursement of any and all amounts that they paid to USCC. As explained by the court in *Huffmaster, supra*, 534 A.2d at 439:

> [NJ UDAP], while silent as to its effect upon the contract, must be read as depriving a technically violating repairman of any enforcement capacity. Otherwise, the act would make no sense. Contracts involving consumer fraud as defined in our act and our administrative code are therefore unenforceable by violators because:
>
> (1) They are void, being contrary to public policy as expressed in the act. *Vasquez v. Glassboro, Services Ass'n.*, 83 N.J. 86, 99 [415 A.2d 1156] (1980); or
>
> (2) They have not been consummated because the conditions precedent established by the Act have not been fulfilled. *Campbell, supra;* [*Campbell v. WABC Towing Corp.*, 78 Misc.2d 671, 356 N.Y.S.2d 455 (Sup.Ct.1974)]; or
>
> (3) They are illegal as to the violator of the Act. *Willison, Contracts*, (3 ed. Jaeger) § 1631, provides that "[a]n innocent plaintiff may recover on an illegal agreement which is not declared void by statute."

*See also Romain*, 279 A.2d at 654 (contract was invalid because the sales price was unconscionable); and *Toker v. Perl*, 103 N.J.Super. 500, 247 A.2d 701 (Law Div. 1968), *aff'd on other grounds*, 108 N.J.Super. 129, 260 A.2d 244 (App.Div.1970) (considering § 2–302 of the Uniform Commercial Code). *Cf. Midland Equities, supra*, 458 N.Y.S.2d at 129 (court orders full restitution since the referral " 'service' provided by respondent was one which was available

free of charge to consumers from local bar associations, advertising, and word of mouth"). N.J.S.A. 56:8–2.11 specifically provides that any person violating NJ UDP shall be liable for a refund of all moneys acquired by means of a deceptive or unconscionable commercial practice. *See also* N.J.S.A. 56:8–2.12 (refund may be recovered in private action). We therefore conclude that the Plaintiffs' actual damages are measured by the entire fee which they paid to USCC.

NJ UDAP also provides that, when a practice is found to be unlawful under the Act, then the court shall award treble damages plus attorneys fees, filing fees and reasonable costs to any person who has suffered any ascertainable loss of moneys or property. N.J.S.A. 56:8–19; *Huffmaster, supra*, 534 A.2d at 439–40; and *Ramanadham v. New Jersey Mfrs. Inc. Co.*, 188 N.J.Super. 30, 455 A.2d 1134 (App. Div.1982). We note that the applicable DC UDAP provides like damages. D.C.CODE ANN. § 28–3905(k)(1). *Cf. Andrews, supra*, 78 B.R. at 84–85 (PA UDAP provides similar remedies). We therefore conclude that assessment of such damages and costs is not only appropriate but statutorily mandated in the present matter.

## VI. THE PLAINTIFFS SHOULD ALSO BE ABLE TO RECEIVE REIMBURSEMENT FOR THEIR FEES PAID ON THE BASIS OF 11 U.S.C. § 329 OF THE BANKRUPTCY CODE

Additional support for our conclusion that Plaintiffs should be reimbursed for fees paid is found in 11 U.S.C. § 329 of the Bankruptcy Code, which provides as follows:

> (a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by

such attorney, and the source of such compensation.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agrement, or order the return of any such payment, to the extent excessive, to—

(1) the estate if the property transferred—

(A) would have been property of the estate; or

(B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 23, or 13 of this title; or

(2) the entity that made such payment.

*See also* B.Rules 2016 and 2017.

▉ We agree with those cases that have held that the court's supervisory powers over fees charged "for services rendered or to be rendered in contemplation of or in connection with" a bankruptcy case extends to lay persons as well as lawyers. *See In re Anderson,* 79 B.R. 482, 486 (Bankr.S.D.Calif.1987). *In re Telford,* 36 B.R. 92 (9th Cir.BAP 1984). *See Jones v. American Bankruptcy Council,* 1 BCD 870 (N.D.Calif.1974) (decided under § 60(d) of the Bankruptcy Act). Section 329 was enacted as a result of Congressional concern about the "serious potential for overreaching by the debtor's attorney." HR Rep. No. 95–595, 95th Cong. 1st Sess. 329 (1977); S.Rep. No. 95–989, 95th Cong.2d Sess. 39–40 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. The potential for such overreaching is equally present where a lay person provides services in connection with or in contemplation of a bankruptcy. In *Jones,* the court notes that it would be anomalous if § 60(d) of the Bankruptcy Act should permit no review of fees charged by a lay person providing legal advice regarding a bankruptcy. 1 BCD at 871.

▉ Here, the district court has upheld bankruptcy court authority under 11 U.S.C. § 329 to order an attorney to return fees paid to him and to a layman operating a business similar to USCC called Eastern Pennsylvania Consumer Counselors where

it found a conspiracy between the two to defraud creditors. *In re Lane,* C.A. Nos. 83–4957 and 84–206, slip op. at 4–5 (E.D.Pa. March 30, 1984). *Cf. O'Connell v. David,* 35 B.R. 141, 144 (Bankr.E.D.Pa.), *modified,* 35 B.R. 146 (E.D.Pa.1983), *aff'd* 740 F.2d 958 (3d Cir.1984) (bankruptcy court has power to order return of fees paid to lay persons engaged in the unauthorized practice of law due to court's inherent powers as a court of equity and pursuant to 11 U.S.C. § 105(a)). The court in *O'Connell* also enjoined the defendant entities from counseling consumers regarding the law of debtor-creditor relationships or consumer bankruptcies and from preparing or filing petitions or schedules in connection with such bankruptcies.[21] *See also In re Stevenson,* 49 B.R. 914 (Bankr.E.D.Pa.1985) (motion to dismiss class action complaint seeking damages and injunctive relief under PA UDAP and 11 U.S.C. § 329 against the same defendant parties as were involved in the *Lane* case denied). Also Local Bankruptcy Rule 2016(c) and Local Bankruptcy Form 2016.1 of this court require that pro se debtors state any amounts paid to a lay "preparer" be disclosed in order that this court can monitor such businesses.

We therefore conclude that 11 U.S.C. § 329 provides this court with alternative, plenary authority to regulate, enjoin, and impose monetary sanctions against lay persons as attorneys who bilk debtors in our court.

## VII. DEFENDANT RHODE IS INDIVIDUALLY LIABLE FOR NJ UDAP VIOLATIONS COMMITTED IN CONNECTION WITH THE OPERATIONS OF USCC

▉ It is clear to us that Rhode was so closely connected with the operations of USCC that he may be held liable for its, as well as his own, violations of NJ UDAP. In *Koscot Interplanetary, supra,* 293 A.2d at 701–03, the court found that the founder and major shareholder of the corporate defendant was so completely and fully identified with the business that he could

---

**21.** One of the entities added as a named defendant in the *O'Connell v. David* lawsuit was USCC.

be held liable for NJ UDAP violations committed by the company. *See also Midland Equities,* 458 N.Y.S.2d at 129. Similarly, we find here that Rhode was in fact the alter ego of USCC, which he utilized to engage in fraudulent and deceptive practices proscribed by NJ UDAP. *See Koscot Interplanetary, supra,* 293 A.2d at 703. Rhode was the founder, president, and sole shareholder of USCC. He was responsible for the overall operations of USCC, including training and supervision of USCC employees. He was also in charge of marketing and advertising. Given his close identity with USCC, he may be held accountable for UDAP violations committed on his behalf. *Id.* at 703.

■ Even apart from his liability for corporate actions, Rhode is liable for his own violations of NJ UDAP. *See Koscot Interplanetary, supra,* 293 A.2d at 703–704; and *Hyland, supra,* 372 A.2d at 373. As noted by the court in *Koscot Interplanetary:*

> When a fraud is committed in the name, and under the cover of a corporation, by persons having the right to speak for it, for their personal gain and benefit, they are bound to answer personally for their wrongful acts.

Indeed, NJ UDAP applies to consumer fraud committed by individuals as well as companies. N.J.S.A. 56:8–1(d). *Hyland, supra,* 372 A.2d at 373.

Rhode himself was in charge of the marketing and advertising which we have found was misleading. Rhode knew and in fact directed the services that were provided by USCC. Presumably, also, it was Rhode who established USCC's fee for its services, which we have found to be unconscionable. Thus, Rhode can be held liable for his own violations of NJ UDAP and is not insulated from such liability simply because his unlawful activities were carried out in connection with a corporation.

■ Unlike Rhode, however, the Plaintiffs have failed to establish that Defendants Betty Rosi or Deborah Tavares were engaged in unlawful activity in violation of NJ UDAP. Accordingly, the claims against these Defendants will be dismissed.

## E. CONCLUSION

■ In light of the above analysis, we conclude that the USCC marketing scheme and fees constituted deceptive, fraudulent, and unconscionable commercial practices in violation of the NJ UDAP. In light of the violations discussed above, we conclude that the agreements between USCC and class members are void and that Plaintiffs are entitled to reimbursement of any funds paid as well as treble damages, attorneys' fees, and costs under NJ UDAP against Defendants USCC and Rhode. However, in addition to assessing monetary damages, we shall issue an injunction enjoining Defendants USCC and Rhode from continuing to engage in deceptive and unconscionable commercial practices in connection with any services rendered in connection or in contemplation of a bankruptcy, as did the court in *O'Connell v. David,* 35 B.R. at 145. Even though USCC is and has been out of business for over five years, it is clearly not an impossibility that either USCC, under different management, or Rhode, under a different corporate guise, could attempt to resume a like business again. *See City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982); and *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) (defendant's voluntary cessation of activity does not render request for injunctive relief moot because otherwise defendant would be free to return to his old ways).

While none of the referral attorneys have been named as defendants in this matter, we are seriously concerned about the suggestions that these attorneys may have been involved in payments for referrals and assisting USCC in the unauthorized practice of law in violation of the Rules of Professional Conduct. *See* RULE 5.4(a) (prohibiting fee-splitting with a nonlawyer); and Rule 5.5(a) (lawyer shall not assist person not a member of bar in the unauthorized practice of law). *Cf.* RULE 5.3(c) (lawyer is responsible for conduct of a non-lawyer associated with or retained by

**340**

the lawyer where the conduct is ratified by the lawyer or if the lawyer knows of and participates in the conduct). We are particularly concerned about the $109,223.30 that was paid to USCC by Daniels. The large amount of funds transferred to Daniels over a relatively short period of time by an agency that was providing no service to consumers other than referral to the attorney paying the fee is strongly suggestive of a payment for referral or fee-splitting arrangement. As a result of our concern in this matter, we shall be transmitting copies of this Opinion to the New Jersey, Pennsylvania, Maryland and District of Columbia offices which investigate improper conduct of attorneys, since the three attorneys in issue practice in these courts.

By our Order dated May 25, 1988, in this matter, the issues of liability and damages were bifurcated. We have determined herein that the agreements between USCC and the plaintiff class members are void and that, in light of the violations of NJ UDAP, the Plaintiffs are entitled to damages in the amount of three times any monies paid to USCC together with attorney's fees and costs. The only remaining issue with respect to damages will be to assess an amount based on the above formula. As a result, we shall give the parties thirty days from the date of our within Recommendations to submit either a stipulation or a motion for summary judgment limited to the assessment of the amount of monetary damages. It is hoped, given the discovery that has been completed, that the parties may agree on the amount of damages. The attached Order shall contain a schedule for the parties' submissions on this issue.